UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND

CIVIL ACTION NO. 0:05-CV-79-HRW

IN RE: HNRC DISSOLUTION COMPANY, et. al.,

FIRST CENTURY BANK, NA TRUSTEE,                    APPELLANT,

V.

SOVEREIGN POCAHONTAS COMPANY,                    APPELLEE.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on appeal from United States Bankruptcy Court for the Eastern District of Kentucky, Judge William S. Howard presiding. The appeal seeks reversal of the Bankruptcy Court's Memorandum Opinion and Order of March 4, 2005 (Bankr. Doc. No. 5625). Also pending before the Court is the motion of Appellee International Coal Group, to dismiss the appeal as moot [Docket No.12]. Both the Appeal and the Motion to Dismiss have been fully briefed by the parties and stand ripe for review.

The Court will first address the Motion to Dismiss. Mootness is a threshold jurisdictional issue, and in the words of the Sixth Circuit, it "cannot be waived or conceded by the actions or admissions of the parties." *In re Jamison,* 1994 WL 284114 at *1. If the Court finds that an appeal or portions of an appeal are moot,

the Court "must dismiss them without ruling on the merits for a lack of mootness is a jurisdictional requirement to any federal case or controversy." *United Mine Workers of America Combined Fund v. CF&I Fabricators of Utah, Inc.,* 169 B.R. 984,990 (D. Utah 1994). After careful consideration and being otherwise sufficiently advised, the Court will sustain Appellee ICG's Motion and dismiss the appeal.

## I. BACKGROUND

This matter arises from the consolidated Bankruptcy proceedings of Horizon Natural Resources. On July 11, 2004, Horizon and its affiliated Ch. 11 debtors ("the Debtors") filed their Third Amended Joint Plan of Reorganization (Bankr. Doc. No. 3526) and Third Amended Joint Liquidating Plan (Bankr. Doc. No. 3527) ("the Plans"). The Plans contemplated the sale of substantially all of the Debtors' remaining assets to the successful buyer or buyers at an auction to be conducted by the Debtors in accordance with bidding procedures previously approved by the Bankruptcy Court. On August 17, 2004, the Debtors conducted the Auction, and the prevailing bidders were a consortium of purchasers that included Newcoal, LLC ("Newcoal") n/k/a International Coal Group, Inc., Oldcoal, LLC ("Oldcoal") n/k/a Lexington Coal Company, LLC ("Lexington" or "LCC") and one other purchaser (collectively, the "purchasers"). On August 31,

2004 the Bankruptcy Court held a hearing (the "August 31 Hearing") on confirmation of the Plans and the proposed sale of assets to the three purchasers who prevailed at the Auction.

The structure of the assumption and assignment was discussed at the August 31 hearing. The Debtors had proposed to assume and assign the Lease with respect to the Marrowbone Mining area to Oldcoal (Lexington) and the Lease with respect to the Jennie's Creek area to Newcoal (ICG). No party expressed disagreement with or objection to this structure at the hearing.

At the August 31 hearing, the Bankruptcy Court indicated its intention to confirm the Plans, as modified, and approve the sale to the three purchasers, including the sale to Newcoal pursuant to an Asset Purchase Agreement dated June 2, 2004 (Bankr. Doc. No. 3172) and the sale to Oldcoal pursuant to an Asset Purchase Agreement dated August 17, 2004 (Bankr. Doc. No. 3915). Shortly thereafter, on September 16 and 17, 2004, the Bankruptcy Court entered orders confirming the Plans (Bankr. Docs No. 4088 and 4089)(the "Confirmation Orders") and an order approving the sale (Bankr. Doc. No. 4085) (the "Sale Order"). The Sale Order refers to all executory contracts and unexpired leases proposed to be assumed and assigned to the purchasers as "Assumed Agreements." It also stated that "The Debtors are authorized, empowered and directed to

implement and consummate all of the transactions contemplated by each [APA]... including, without limitation... to assume and assign to the applicable Purchaser the applicable Assumed Agreements, all on the terms of the applicable Agreement..." (Sale Order, ¶ 5)

The Confirmation Orders then expressly incorporated this approval of assumption and assignment of leases pursuant to the terms of the Sale Order. Neither Appellant nor any other landlord moved for reconsideration or filed a notice of appeal of the Sale Order or the Confirmation Order. As of September 30, 2004, the Debtors closed the sale of their assets to ICG and the other approved purchasers, the Plans became effective, and the Debtors were deemed dissolved in accordance with the Confirmation Orders.

On January 7, 2005, Sovereign Pocahontas Company ("Sovereign") filed a motion requesting a ruling by the Bankruptcy Court as to a dispute that had arisen as to the appropriate interpretation of the Sale and Confirmation Orders with respect to the assumption and assignment of the lease held by Appellant First Century (the Closterman lease). Specifically, Sovereign requested the Bankruptcy Court to rule that, as a result of the Sale and Confirmation Orders, two agreements– an overriding coal royalty agreement (the "Sovereign Pocahontas Override Agreement") and a related nonresidential real property lease dated June

19, 1975 with Appellant First Century as landlord on behalf of the estate of Henry Closterman (the Closterman lease)–were assumed by East Kentucky Energy Corporation, one of the Debtors, and assigned in part to Newcoal (ICG) and in part to Oldcoal (Lexington). The Sovereign Pocahontas Override Agreement and the Closterman Lease relate to certain nonresidential real property located partially in the "Jennie's Creek" area of Mingo County, West Virginia (the "Jennie's Creek Area") and partially in the adjacent "Marrowbone" area (the "Marrowbone Mining Area").

The Lease Split issue was among the issues raised by Sovereign's Motion. In this regard, the Motion states that Sovereign's position that the Lease was "assumed and assigned to ICG/LCC." Sovereign requested that the Court determine that, pursuant to the Sale Order and the Confirmation Orders, the Lease was "assumed and assigned to LCC and/or ICG."

During the course of the Debtors' Chapter 11 cases, the Bankruptcy Court entered a series of orders that extended the Debtors' statutory deadline under Section 365(d) of the Bankruptcy Code for deciding whether to assume or reject the Lease. The last such extension was set forth in the Bankruptcy Court's Sixth Order Extending Time to Assume, Assume and Assign, or Reject the Marrowbone Leases (Bankr. Doc No. 4025) (the "Sixth Extension Order"), which extended the

deadline for that determination until September 29, 2004.

In its objection to the Sovereign Motion, Appellant First Century contended that the Lease was not assumed and assigned by the Debtors because under the Sixth Extension Order, the Debtors' deadline to assume or reject the Lease expired on September 29, 2004, prior to consummation of the assumption and assignment. Appellant also argued that the Lease should be deemed rejected because the undisputed cure amount was not paid prior to September 29, 2004. Appellant also contested the Lease Split issue.

On January 24, 2005, the Bankruptcy Court entered an order directing mediation of the subject matter of the Sovereign Motion. On January 28, 2005, mediation was conducted but did not result in a settlement. On January 31, 2005, ICG filed its memorandum regarding the Sovereign Motion. On February 2, 2005, the Bankruptcy Court held a hearing on the Sovereign Motion (the "February 2 hearing").

On January 31, 2005, Appellant commenced an adversary proceeding in the Bankruptcy Court against ICG, Sovereign, Lexington, and other parties to determine essentially the same issues raised by the Sovereign Motion. On March 4, 2005, the Bankruptcy Court entered an Opinion and Order sustaining the Sovereign Motion and Overruling the request for relief by Appellant First Century.

The Court ordered the parties to "proceed forthwith to comply with the terms of the confirmed plans of reorganization specifically with respect to assumption of the agreement with Sovereign Pocahontas Company and the Closterman Lease property." Relevant discussion by the Bankruptcy Court in this regard is as follows:

> The Newcoal APA (Doc. #3172) lists the contract with Sovereign as a non-executory contract in Schedule 2.1(a)(vii) attached thereto. Schedule 2.1(b) to that Asset Purchase Agreement identifies the Closterman Heirs' Lease as a lease being assumed and assigned to Newcoal and refers to the area as Jennies Creek. The Oldcoal APA appears to entitle Oldcoal to any and all other portions of the Closterman Lease and require the assumption thereof by the Debtor. Schedules 2.1(a)(vii) and 2.1(b) to the Newcoal APA identify an override agreement and assignment between the Debtor and Sovereign which is clearly the contract at issue herein. As reflected by the debtors' report of sale (Doc #3824) and the order approving the sale (Doc. #4085), cure amounts are listed for Sovereign and for First Century.
>
> This set of facts, in which the Debtors listed Sovereign as a contract that was not executory but provided for the cure amounts which Sovereign did not object to, were all adopted by and assumed in the plans of reorganization confirmed by the court in this matter. *Those plans of reorganization are final orders of this court and res judicata applies to prevent relitigating the terms thereof...*
>
> ... The court holds that the unequivocal intent of the debtor to assume the coal lease in issue, the listing of cure amounts for the Sovereign Pocahontas agreement, and the approval of the payment of those amounts by the Debtor to cure defaults in the agreement indicate Debtor's intention to assume the Sovereign Agreement and Closterman Lease and assign that lease to Newcoal and Oldcoal.

March 4 Opinion and Order at 4-6 (emphasis added).

On March 25, 2005, Lexington tendered to the Bankruptcy Court an Agreed Order (the "Agreed Order") describing certain transactions and resolving First Century's adversary proceeding. As described in the Agreed Order, which was signed by counsel to Appellant and counsel to ICG among other parties, Appellant entered into: (1) a Memorandum of Understanding (the "Marrowbone MOU"), dated February 15, 2005, with other members of the Marrowbone Lessors Association, Consol Energy, and Eaglehawk Carbon (together with Consol and their designated joint venture entity, as contemplated in the Marrowbone MOU, the "JV parties); and (2) a Memorandum of Understanding (the "Lexington MOU"), dated February 18, 2005, with Lexington and the JV parties.

As further described in the Agreed Order, Lexington and the JV Parties agreed under the Marrowbone MOU and the Lexington MOU that the Lease and other leases with the Marrowbone lessors, to the extent of the Marrowbone Mining Area, would be deemed assumed by the Debtors and assigned to Lexington. The parties further agreed that, as the Lease contains acreage in both the Marrowbone Mining Area and Jennie's Creek Area, only that portion of the Lease that relates to the lands and reserves within the Marrowbone Mining Area would be deemed to have been assumed and assigned by the parties' agreement.

At the same time that the transactions contemplated by the Marrowbone MOU and the Lexington MOU were entered into, Appellant and ICG entered into a Partial Surrender Release and Termination Agreement (the "ICG/First Century Release"). By the ICG/First Century Release, the parties agreed that ICG would release any interest it might have in the Lease with respect to the Marrowbone Mining Area, and all rights and obligations that ICG may have under the Lease relating to the Marrowbone Mining Area, if any, would be terminated.

After a hearing on March 29, 2005, the Bankruptcy Court determined that entry of the Agreed Order was unnecessary for the transactions contemplated in the Order to close and declined to enter the Agreed Order. Accordingly, on about March 29, 2005, the transactions described by the Agreed Order closed. On March 29, 2005, Appellant First Century filed a notice of voluntary dismissal of its adversary proceeding.

## II. DISCUSSION

ICG moves this Court for an Order dismissing the Appeal, pursuant to Rule 8011 of the Federal Rules of Bankruptcy Procedure. ICG urges dismissal of the appeal for mootness on three separate grounds: i.) statutory mootness under Section 363(m) of the Bankruptcy Code; ii.) equitable mootness; and iii.) constitutional mootness as regards the lease split issue. The Court finds the appeal

is moot under the doctrine of equitable mootness, as adopted by the Sixth Circuit, and therefore declines to address the additional grounds for dismissal.

Equitable mootness "is not an Article III inquiry as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization cases." *GWI PCS Inc. v. United States,* 230 F.3d 788, 800 (5th Cir. 2000), quoting *Manges v. Seattle-First Nat'l Bank (In re Manges),* 29 F.3d 1034, 1038-39 (5th Cir. 1994). Under the doctrine of equitable mootness, "a plan of reorganization, once implemented, should be disturbed only for compelling reasons." *City of Covington v. Covington Landing Ltd. Partnership,* 71 F.3d 1221, 1225 (6th Cir. 1995), quoting *In re UNR Indus., Inc.,* 20 F.3d 766, 769 (7th Cir. 1994)(quotation marks omitted).

The Sixth Circuit analyzes three factors in determining whether an appeal is equitably moot: (1) whether a stay has been obtained; (2) whether the plan has been substantially consummated; (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan. *In re American Homepatient, Inc.,* 420 F.3d 559, 564 (6th Cir. 2005). These factors apply to preserve a restructuring once it has been consummated. In this case, all three factors weigh heavily against Appellant First Century. Additionally, the Court finds it worthy of observation that First Century simply does not respond, does not

even attempt to respond, to ICG's equitable mootness argument.

At the outset, the Court notes that while First Century's Appeal seeks reversal of the Bankruptcy Court's March 4, 2005 order (i.e., not the Confirmation and Sale Orders), the primary effect of the relief sought would be to undo the terms of the Asset Purchase Agreements approved and directed to be implemented under the Plan in the Sale and Confirmation Orders. Accordingly, the appeal amounts to a collateral attack on the Sale and Confirmation Orders.

It is undisputed that First Century did not even initially appeal, let alone obtain (or even seek to obtain) a stay of, consummation of the asset sales and the Plans. It is an important policy of Bankruptcy law that court-approved reorganization plans be able to go forward unless a stay is obtained. *Bennett v. Veale,* 60 F.3d 828, 1995 WL 385147, p.2 (6th Cir. 1995)(Unpublished Opinion). While the failure to seek a stay in itself is not determinative, it is highly relevant. *Id.* A party that elects not to pursue a stay bears the risk that a speedy implementation of a confirmation order will moot an appeal. *See Matter of Specialty Equipment Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993).

In addition, ICG argues that equity weighs in its favor under the second factor because the Plans have been substantially consummated. Substantial consummation is defined in Section 1101(2) of the Bankruptcy Code as a: (1)

11

transfer of all or substantially all of the property proposed by the plan to be transferred; (2)assumption by the debtor or by the successor to the debtor under the plan of the business or the management of all or substantially all of the property dealt with by the plan; and (3) commencement of distribution under the plan. 11 U.S.C. § 1101(2). Substantial consummation of a plan "raises a presumption that the appeal is moot and should be dismissed." *In re Eagle Picher Indus., Inc.,* 1998 WL 939869, p.4 (6th Cir. 1998)(Unpublished Opinion).

In this case, the sale of the assets has long been complete. Moreover, the Debtors dissolved shortly after closing. In addition, ICG submits that the plan has been substantially consummated as evidenced by the following transactions: 1.) Disbursements in amounts exceeding $200 million by the Debtors to hundreds of parties, including the Debtors' debtor in possession lender Deutsche Bank and other institutional creditors, parties to assumed and assigned executory contracts and unexpired leases and taxing authorities; 2.) A transfer of approximately $1.5 million to hundreds of the Debtors' former employees; 3.) Payment of approximately $1 million to former key employees of the Debtors pursuant to a court-approved key employee retention program and separate employment agreement; 4.) Exchange of $465 million in notes and $145 million in cash to second-tier noteholders in exchange for equity in Lexington and ICG; 5.) Funding

of total credit facilities in the aggregate amount of $245 million for ICG as of the closing, an amount which has increased since that time and been syndicated to involve more than five different banks; 6.) Drawing of letters of credit in connection with the payment of the debt outstanding under the debtors' postpetition credit facility; 7.) Dismissal of hundreds of prepetition lawsuits against the Debtors; 8.) Cancellation of all equity interests in the Debtors; 9.) Termination of the Debtors' employee compensation and benefit programs; 10.) The assumption of hundreds of contracts and leases by the Debtors and the subsequent assignment of those contracts and leases to the Purchasers; 11.) The renegotiation of certain of those contracts and leases; 12.) The transfer to the Purchasers of substantially all assets of the Debtors, evidenced by the transfer and filing of real property instruments, the transfer and registration of hundreds of motor vehicle titles and bills of sale for other personal property; 13.) The commencement of the coal mining business by ICG with the use of these assets; 14.) The termination of the Debtors' authorization to do business in multiple jurisdictions; 15.) ICG's entry into a binding Permitting and Reclamation Plan Agreement to address Debtors' multimillion dollar reclamation and other environmental and public health and safety obligations; 16.) The transfer to the Purchasers of hundreds of coal mining and related permits issued by regulatory authorities; 17.) Debtors' termination of

all operations and all employees, as well as the end of the Debtors' business; and 18.) Assumption by Lexington of more than $180 million in estimated reclamation costs and tens of millions of dollars in environmental monitoring, water treatment maintenance and other costs.

The Court agrees with Appellee that these transactions, entered into in reliance upon the confirmed plan, cannot be undone. This would seem to include the assumption and assignment of the Closterman lease. Notably, Appellant First Century does not contest the substantial consummation of the plan.

Nor does First Century dispute the third factor in the equitable mootness analysis– whether the relief requested would affect the rights of parties not before the Court or the success of the plan. The record contains evidence of a series of post-confirmation transactions regarding the areas covered by the Lease assignments. ICG argues, and the Court agrees, that reversal of the Sale and Confirmation Orders with respect to the Closterman Lease would prejudice a number of third parties. The subsequent transactions with regard to the Marrowbone Mining Area involve several additional parties that are not parties to this appeal.

In its failure to respond to ICG's argument concerning equitable mootness, Appellant First Century has not provided the Court with any compelling reason

why the assignment of the Lease under the terms of the Plan, as approved by Judge Howard, and as relied upon by various parties, should or could be disturbed. The Court is left with no choice but to dismiss the appeal as moot.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby SUSTAINS Appellee ICG's Motion to Dismiss. A separate judgment shall issue this day in conformity with the Court's Memorandum Opinion.

This March 28, 2006.

Signed By:
**Henry R Wilhoit Jr.**
United States District Judge